UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION


United States of America,          )
                                   )
                  Plaintiff,       )
                                   )
          vs.                      )      File No. 4:12-cr-177-1
                                   )
Jeffrey Jim Butler,                )
                                   )
                  Defendant.       )


TRANSCRIPT OF CHANGE OF PLEA


Taken at
United States Courthouse
Bismarck, North Dakota
April 23, 2013


BEFORE THE HONORABLE DANIEL L. HOVLAND
-- UNITED STATES DISTRICT COURT JUDGE --

<u>APPEARANCES</u>

MR. DAVID D. HAGLER
U.S. Attorney's Office
220 E. Rosser Ave.
P. O. Box 699
Bismarck, North Dakota 58502-0699

FOR THE UNITED STATES

- - - - - - - - - -

MS. HEATHER McCORD MITCHELL
Assistant Federal Public Defender
Federal Plaza
324 North Third Street, Suite 1
Bismarck, North Dakota 58501

FOR THE DEFENDANT

- - - - - - - - - -

Certificate of Court Reporter - Page 54

- - - - - - - - - - - -

1          (The above-entitled matter came before the Court, The

2     Honorable Daniel L. Hovland, United States District Court

3     Judge, presiding, commencing at 2:57 p.m., Tuesday, April 23,

4     2013, in the United States Courthouse, Bismarck, North Dakota;

5     with counsel appearing on behalf of the respective parties as

6     hereinbefore indicated.   The following proceedings were had and

7     made of record in open court with the defendant present.)

8                   - - - - - - - - - - -

9          THE COURT:   We will open the record in the case

02:57    10     entitled *United States versus Jeffrey Jim Butler*.   Here on

11     behalf of the Government is Assistant U.S. Attorney Dave

12     Hagler.   Representing the defendant is Assistant Federal Public

13     Defender Heather Mitchell.   Mr. Butler, how are you, sir?

14          THE DEFENDANT:   I'm doing fine, sir.

15          THE COURT:   This is scheduled as a change of plea

16     hearing as a result of a Plea Agreement filed on April 12,

17     2013.   The charges at issue are kidnapping and a drug

18     trafficking offense, as set forth in Count 1 and Count 3 of the

19     Indictment.   Mr. Hagler, what are the parties contemplating

02:58    20     here under the terms of the Plea Agreement and the advisory

21     sentencing guidelines?

22          MR. HAGLER:   Your Honor, as we have outlined in

23     detail in the Plea Agreement, we anticipate an offense level 41

24     on the kidnapping charge and an offense level 42 on the drug

25     offense.   There will be a multiple-count adjustment likely to

3

1    result in an offense level of 44.   After a three-level

2    reduction, that would take it to 41.   Frankly, anything over a

3    Criminal History Category I at that point, and I believe he is

4    likely, in my estimation, Your Honor, to be like a III or a IV

5    category, would be -- result in a 360-month to life range, and

6    that's really what we're anticipating, Your Honor.

7         THE COURT:   And those are your preliminary

8    calculations as well, Ms. Mitchell?

9         MS. MITCHELL:   Yes, Your Honor.

02:59    10         THE COURT:   Mr. Butler, I need to ask you some

11   questions here this afternoon about your desire to plead guilty

12   to these two crimes.   I'm going to have you sworn in first, and

13   then I'll ask you some questions.

14        THE DEFENDANT:   Yes, sir.

15        THE CLERK:   Please stand, raise your right hand.

16                    JEFFREY JIM BUTLER

17   having been first duly sworn, was examined and testified as

18   follows:

19        THE COURT:   Mr. Butler, I know a little bit about

03:00    20   what went on in this case, not because I've seen the discovery,

21   but just because I've taken pleas from, I believe, three other

22   co-defendants.

23        THE DEFENDANT:   Yes, sir.

24        THE COURT:   I don't know a whole lot about you other

25   than what they've told me, but maybe you could tell me, first

                                  4

1   of all, how old you are, where you grew up, and where you went

2   to school.

3           THE DEFENDANT:  Your Honor, I'm 46 years old.  I just

4   turned 46 this last March the 13th.  I grew up in -- I was born

5   in Bowie, Texas; Montague County, Texas.  I grew up basically

6   in Stephenville, Texas; Breckenridge, Texas, wherever my father

7   at the time chose to be a pipeline oil field welder.

8           THE COURT:  Father still living?  Mother still

9   living?

10          THE DEFENDANT:  No, sir.

11          THE COURT:  Neither?

12          THE DEFENDANT:  Sir?

13          THE COURT:  Neither of them?

14          THE DEFENDANT:  No, sir.

15          THE COURT:  Do you have brothers and sisters?

16          THE DEFENDANT:  Yes, sir, I do.

17          THE COURT:  How many of each?

18          THE DEFENDANT:  I have two older brothers and three

19  older sisters.  I'm the youngest of six.

20          THE COURT:  And do your siblings know what trouble

21  that you're in?

22          THE DEFENDANT:  No, sir, I have no contact with them.

23          THE COURT:  Why is that?

24          THE DEFENDANT:  We were not raised as a tight family.

25  As a matter of fact, I could never, ever remember my dad ever

5

1    once telling me, you know, exactly how proud he was of me or

2    ever telling me that he loved me even until the time he died.

3    My mom and dad separated when I was eight years old.  I had

4    been run over by a car.  I was in a leg cast.  My mother

5    basically told my dad, "I'm taking the older of the brothers

6    and you're having to deal with him because of his medical

7    issues."  At that time she didn't want nothing to do with it.

8              THE COURT:  Did you graduate from high school?

9              THE DEFENDANT:  No, sir.  I completed the -- I

03:02   10   completed the tenth grade.  Started school in Colorado City,

11   Texas, at Colorado City High.  My junior year, was a candidate

12   to go play football for Texas Tech. University.  I watched my

13   very best friend die on the football field, and I chose to quit

14   school at that time.

15             THE COURT:  He died from what?

16             THE DEFENDANT:  He had an aneurism, which is a

17   weakening in the blood vessel walls to the brain.  September,

18   the -- September 26th of 1983 he got blind-sided, and he got

19   hit so hard that it cracked the ear -- where the ear hole was

03:03   20   on a Riddell 361 helmet, cracked it two inches causing swelling

21   on the brain, and he began to convulse right there on the

22   football field.

23             THE COURT:  And how is your physical health today?

24   You've got a neck brace on.

25             THE DEFENDANT:  Yes, sir.  Other than the neck injury

6

1   that I sustained on April the 18th of last year in Williston,

2   my physical condition is good.  The neck injury is -- it's pain

3   daily, and the doctor in Minot suggested that there should be

4   surgery to remove the disk in my neck because the C-2 and the

5   C-3 are smashed together and it's closing around my spinal

6   cord, which at various times you'll see that certain parts of

7   my body will twitch, and that's because of the spinal fluid is

8   not getting through the --

9          THE COURT:  So how long have you been wearing a neck

03:04   10   brace?

11          THE DEFENDANT:  Since April 18th.

12          THE COURT:  2012?

13          THE DEFENDANT:  Yes, sir.

14          THE COURT:  Okay.  Other than that, how's your

15   overall physical health?

16          THE DEFENDANT:  Overall physical health is pretty

17   fair, yes, sir, I would say.

18          THE COURT:  And what about your overall mental

19   health?

03:04   20          THE DEFENDANT:  My mental health is in very good

21   stability other than the situation at hand.

22          THE COURT:  All right.

23          THE DEFENDANT:  Yes, sir.

24          THE COURT:  Have you ever been treated for any

25   psychological, psychiatric or mental disorders?

7

1          THE DEFENDANT:   No, sir.

2          THE COURT:   Have you ever been treated for drug or

3    alcohol problems?

4          THE DEFENDANT:   I went to a SARP unit, which is

5    Substance Abuse and Recovery Program in Wichita Falls, Texas,

6    in 1988-'89, I believe.   I completed a 36-day program there.

7    Ninety days later I failed that program.

8          THE COURT:   So where have you been living most of

9    your adult life?

03:05    10          THE DEFENDANT:   Most of my adult life I lived in

11    Gainesville, Texas; Colorado City, Texas.   I lived down in

12    Corpus Christi, Texas, for nine months, just basically here and

13    there all over the state of Texas, sir.

14          THE COURT:   When did you come to North Dakota?

15          THE DEFENDANT:   I come into North Dakota in March of

16    2012.

17          THE COURT:   And why?

18          THE DEFENDANT:   I come up here seeking -- seeking

19    employment through the oil field, which in Texas I used to work

03:06    20    for Patterson Drilling, which is one of the largest land-based

21    oil companies there is.   I got hurt with them several years

22    ago.   I come up here to either work in the oil field or work

23    construction, and that's where I got injured, is -- I was in

24    the midst of actually building my own company in Williston.

25          THE COURT:   You were injured in North Dakota?

8

1          THE DEFENDANT:  Yes, sir.  I was -- I was injured on

2     a job right across from the Walmart park -- Walmart shopping

3     center in Williston, at an apartment complex they were

4     building.

5          THE COURT:  And what type of an injury?

6          THE DEFENDANT:  It was the C-2 and the C-3.  There

7     was a roll roofing -- it's called ice and water shield.  I

8     don't know if you know anything about roofing, but it weighs

9     about 90 pounds.  Forklift operator run up to the garage that I

03:07  10     was to be roofing, and there was nobody on the garage to catch

11     it.  Dropped an ice and water shield and pulled out.  And I had

12     just put my belt on while underneath to get onto the ladder,

13     and it slid 18-foot and hit me in the back of the neck.  For

14     nine-and-a-half hours I couldn't feel anything from the neck,

15     down.

16          They flew me from Minot -- I mean from Williston to

17     Minot.  The neurosurgeon there said that I had a nine-hour

18     window point, that if the swelling and the spinal cord didn't

19     start to dissipate then and I started getting the feeling back

03:07  20     in my fingers and my feet, that they were going to go in and do

21     an emergency bone graft with the -- with the disk then.  Right

22     about eight-and-a-half hours after the accident I started to

23     get numbness -- not numbness, but tingling in the bottom of my

24     feet, and they had me up and two people were walking me in the

25     hallway.  They said that's probably what saved my legs.

1          THE COURT:  So is there a pending Workers Comp.

2     claim?

3          THE DEFENDANT:  At that -- up until the time I was

4     arrested, yes, sir, there was.  At the time -- at the time I

5     was arrested, I was another several -- several weeks later --

6     by the North Dakota Workmen's Comp. Commission, that once I was

7     arrested, that that froze that right there.

8          THE COURT:  So how long have street drugs been a part

9     of your life?

03:08    10          THE DEFENDANT:  I was introduced to amphetamines when

11     I was 15 years old by my older sister, who was 30 at the time,

12     and it's been sporadic use ever since.

13          THE COURT:  Did the usage escalate after you got to

14     North Dakota?

15          THE DEFENDANT:  No, sir.  When I first got here to

16     North Dakota, when I first come into this state, I had no prior

17     knowledge of anybody, you know, to acquire drugs off of at that

18     time.  And my main motivation at that point was to find work up

19     until the time I got hurt.  Then there was -- there was no

03:09    20     money, no -- I was injured and there was basically nowhere to

21     turn, and I know that's -- that's not a -- that's not

22     justifying the means of what happened here.  It's just that's

23     how it went.

24          THE COURT:  So before you ever came to North Dakota,

25     had you ever been involved in selling and trafficking of

10

1    methamphetamine or any other street drug?

2              THE DEFENDANT:  I had been in Texas several -- two

3    years prior.  I had -- I had sold drugs down there, yes, sir.

4              THE COURT:  And specifically what?

5              THE DEFENDANT:  Amphetamine.

6              THE COURT:  Methamphetamine?

7              THE DEFENDANT:  Yes, sir.

8              THE COURT:  So when you came up to North Dakota in

9    March of 2012, were you using regularly?

03:10   10              THE DEFENDANT:  No, sir, not at that time, nope.

11              THE COURT:  And when do you best recall that you

12    started using meth again?

13              THE DEFENDANT:  It was probably about a week after I

14    got out of the hospital in Minot.

15              THE COURT:  And that was in about --

16              THE DEFENDANT:  At that time I was -- they had given

17    me percocets and OxyContins, and I'm not real good with, you

18    know, downers or --

19              THE COURT:  But you got out of the hospital

03:10   20    approximately when?

21              THE DEFENDANT:  I went in on April the 18th, and I

22    was out April the 21st.

23              THE COURT:  And then you returned to Minot?

24              THE DEFENDANT:  No, I returned --

25              THE COURT:  Or Williston.

11

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  And in Williston you were living where?

3          THE DEFENDANT:  At that time I was living behind the

4    MMA building.  It's the old furniture store there right off of

5    Highway 2.  I can't remember the gentleman's name that owns the

6    place now, but we were plugged into his electricity behind

7    the -- behind that MMA building.

8          THE COURT:  Living in a camper of sorts?

9          THE DEFENDANT:  Yes, sir.  It was a Dodge, a '76

03:11   10   Dodge Winnebago camper thing.  That was mine and my wife's.

11   Yes, that's what we had.

12         THE COURT:  And your wife was living in Williston

13   with you?

14         THE DEFENDANT:  She was, yes, sir.

15         THE COURT:  What's her name?

16         THE DEFENDANT:  Maggie Butler.

17         THE COURT:  And where's she now?

18         THE DEFENDANT:  She's at the Tompkins Rehab. Center,

19   sir.

03:12   20         MS. MITCHELL:  In Jamestown.

21         THE DEFENDANT:  In Jamestown.

22         THE COURT:  So she must have been charged at the

23   State level with something?

24         THE DEFENDANT:  Yes, sir.

25         THE COURT:  And what was she charged with?

12

1          THE DEFENDANT:   The initial charge was ingestion and

2     drug paraphernalia, and also she was charged with a felon in

3     possession of firearm.

4          THE COURT:   So she's a convicted felon.

5          THE DEFENDANT:   Yes, sir.

6          THE COURT:   Out of Texas?

7          THE DEFENDANT:   Yes, sir.

8          THE COURT:   And been a meth user as well?

9          THE DEFENDANT:   Yes, sir.

03:12  10          THE COURT:   And was meth the drug that was involved

11     in the State charge?

12          THE DEFENDANT:   Yes, sir.

13          THE COURT:   And how long was her sentence?

14          THE DEFENDANT:   I think she received -- I was

15     notified she received a three-year sentence, suspended by 18.

16          THE COURT:   And how old is she?

17          THE DEFENDANT:   She's 36, Your Honor.

18          THE COURT:   So what's she going to do when she gets

19     out?

03:12  20          THE DEFENDANT:   At this point I have no idea.   That's

21     as honest as I can tell you.

22          THE COURT:   Two of you have been together how long?

23          THE DEFENDANT:   Eight years.

24          THE COURT:   Either of you have children?

25          THE DEFENDANT:   I have four children.   They're in

1    Texas.   They're all grown.   And she has two that her mother has

2    in Lubbock, Texas.

3            THE COURT:   So how do you -- when you look back, how

4    did you get down this path that put you in the -- embroiled in

5    the federal criminal justice system facing these serious

6    charges?

7            THE DEFENDANT:   Your Honor, the wife and I made a --

8    when I got hurt, we made a decision to go out to a bar in

9    Williston and basically look for some dope.   And I run across a

03:13   10   guy there that he sold some dope to me, and when me and my wife

11   done it, it made my wife really, really sick and really --

12           THE COURT:   Sold you meth?

13           THE DEFENDANT:   Yeah.   It was cut.   It was cut real

14   bad and it -- it aggravated me and angered me to the point that

15   when I found out that the people up here were paying outrageous

16   dollar amounts for meth, that I figured that, you know, if

17   they're going to pay that kind of money, they ought to get a

18   better deal than what they're getting.

19           THE COURT:   So what did you consider to be an

03:14   20   outrageous sum for a gram or an ounce or an eightball?

21           THE DEFENDANT:   Well, they were charging at that time

22   $200 a gram in Williston.

23           THE COURT:   And you figured that you could get better

24   dope and sell it at a lesser cost or even the same price.

25           THE DEFENDANT:   Well, one thing was -- one thing that

14

1    had ticked me off is the guy that was selling the dope at the

2    time, if you want to say if I had a pure objective, and that

3    was to shut him out of business so he wasn't selling bad dope

4    and putting anybody in the hospital anymore.  I mean, that

5    sounds -- that's not justifying.  I'm not justifying what I've

6    done and I'm not looking for an escape goat, or anything, but

7    at that point in time, that become between me and this other

8    person, you know.

9         THE COURT:  Was this somebody that you just met in

10   the bar for the very first time that evening, or you knew him

11   before?

12        THE DEFENDANT:  I had knew of him, but didn't know --

13   didn't actually know him.

14        THE COURT:  But you knew he sold dope.

15        THE DEFENDANT:  Yes, sir, I knew he sold dope.  And

16   my wife was not -- not the only person that he had sold cut

17   dope or freight dope to and had ripped people off, so like I

18   said, I'm not -- I'm not trying to justify it, but my aim was

19   to shut him down and make sure he did not make another dollar

20   in Williston.

21        THE COURT:  So how did you go about doing that?

22        THE DEFENDANT:  Ground and pound footwork, talk to

23   this one, you talk to that one, and then, you know, finally you

24   meet somebody that you can -- that's got a quantity enough that

25   you go in and you say, "Hey, look, it's either put up or shut

03:15

03:16

15

1    up.  I got the money here.  We're either dealing or I'm turning

2    around and walking off."

3                THE COURT:  And I'm not going to get into specifics

4    with you here about who you acquired larger quantities from,

5    but were your sources of supply instate or out of state or

6    both?

7                THE DEFENDANT:  There was one -- two instate and one

8    that I know of that come out of state and one that was being

9    prepared coming out of state.

10               THE COURT:  But primarily three sources of supply,

11   working on a fourth.

12               THE DEFENDANT:  Yes, sir.

13               THE COURT:  Okay.  And would you have been the

14   primary or the sole person that would have made the contacts

15   with these sources and then traveled or in some fashion

16   acquired the quantities of drugs, or --

17               THE DEFENDANT:  Yes, sir, that would -- that would

18   have been me.

19               THE COURT:  And you on occasion traveled out of

20   state?

21               THE DEFENDANT:  No, sir.

22               THE COURT:  Okay.  Somebody brought it to you

23   instate.

24               THE DEFENDANT:  Yes, sir.

25               THE COURT:  To Williston.

16

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  And in terms of quantities, give me your

3     best guesstimate as to quantities per week or per month,

4     whatever is easiest for you to calculate.

5          THE DEFENDANT:  Okay.  This -- to be honest with you,

6     Your Honor, this is where I've had a little difficulty with the

7     paperwork stuff.  We were just getting basically started.  I

8     had just gotten good enough footholds to be able to start

9     purchasing by the ounce or, you know, by the quarter pound or

10    by a half pound.  The paperwork says anywhere in between 1.5

11    kilo to 5 kilos.  If in between that 90 days -- 90-some-odd day

12    period, if I sold -- or, well, I didn't -- that's another

13    thing.  If I purchased anywhere from a half a pound to

14    three-quarters of a pound, that would probably be pushing it.

15    I mean, I would even say maybe a pound, you know.

16         THE COURT:  Total?

17         THE DEFENDANT:  Total and in that --in that

18    three-month period.  I was -- we were just basically getting

19    started.

20         THE COURT:  And the three-month period you're talking

21    about is what?

22         THE DEFENDANT:  From May the 1st, when I moved into

23    the backyard on 823 Broadway -- West Broadway, until

24    August 26th, when we were arrested.

25         THE COURT:  Of course, I haven't been doing this my

whole life, but I've been at it for more than a decade, and most of the people that I see, 99 percent of them that are involved in drug trafficking operations, they tend to minimize the quantities rather than speak candidly and forthright about the precise quantities.  And sometimes they were using and they just don't have a real good recollection of how much they were buying and using and selling.

THE DEFENDANT:  I started -- when I started -- when I started with my first purchase there in Williston probably the first week of May, my first purchase was, I purchased two grams.  Okay.  I took those two grams and I sold -- the money for those -- and I doubled the money for that, and that process began at that time to staircase upward.

There was sometimes -- I mean, you have to take a look -- okay.  There was -- there was the four boys, my wife and myself, and we were all users.  And myself at that point in time, I was using at least a gram by myself a day, and you could -- you could probably safely average each one of us was using a gram or more a day, and so that's -- that's 7 grams.  That's a quarter ounce right there.  So if I bought a half ounce, which is 14 grams, 7 of that was going for personal consumption.  And then I would have to take that seven and duplicate it and duplicate it.  It was a slow process.  It was -- it was not something that, you know, you just jump in and all of a sudden, you know, it's -- it's like the movie,

18

1    "Scarface."  It was not like that.  It's -- it was a slow

2    process.  It was a stairstep process.

3         And we had -- we had expenses that we went through.

4    I mean, everybody smoked cigarettes.  That's two packs of

5    cigarettes a day with seven people.  You had to feed them.  You

6    had gas.  You know, there were -- it just -- it really blew my

7    mind when she said 5 kilos, and I'm going, okay.  Wait a

8    minute, you know.  Yeah, it kind of -- I said wait --

9         THE COURT:  Well, in the --

10        THE DEFENDANT:  Let's get a little more realistic.  I

11   mean, I was -- I was on my way.  If you would have been four

12   months down the road, then, yeah, maybe we would have been

13   talking that much.

14        THE COURT:  Of course, in the Plea Agreement at

15   Count 3, paragraph 13, you have agreed that there was somewhere

16   in the range of 1.5 kilos to 5 kilos of meth that were a part

17   of the conspiracy.  That's -- 1.5 kilos at 2.2 pounds per kilo

18   is -- you can do the math.

19        THE DEFENDANT:  Yeah, that's what -- that's what I

20   said.  That's the only -- only thing about this whole thing

21   that I'm having a hard time, you know, but other than that, you

22   know, like the lawyers and everybody said, even if they drop

23   it, that's not going to change my --

24        MS. MITCHELL:  I might be able to shed a little more

25   light on that.  The original Plea Agreement that Mr. Volk sent

19

1    over had between 5 and 15 kilos, and that was something --

2    that's why Mr. Butler has taken, I guess, longer to plead,

3    because Mr. Volk and I were going back and forth working with

4    the numbers.  We agreed to stipulate to the 1.5, and then when

5    Mr. Hagler took over, we agreed to stipulate to that lower

6    amount, the between 1.5 and 5.  Basically our goal was to get

7    to a certain guideline calculation, and once that was achieved,

8    then I think that amount is a happy medium, I guess you could

9    call it.

03:24

10            THE COURT:  Well, that might be, but if Mr. Butler

11   isn't going to acknowledge that and agree to that here today,

12   then he's not really agreeing to the quantities that are

13   associated with Count 3 of the Indictment and the Plea

14   Agreement.

15            MS. MITCHELL:  I think there's also -- in the

16   discovery there was also sufficient evidence of maybe a larger

17   quantity by some admissions by some of the parties, so, I mean,

18   again, I think that amount is a happy medium.

19            THE DEFENDANT:  And like I said, the math -- I'm

03:25

20   going to plead to this because -- the reason is, I'm guilty of

21   a lot of things in these things, and I'm not trying to weigh

22   one to out-justify the other.  You know, there is a lot that I

23   am guilty of.  There's a lot that I'm -- that I'm not, but this

24   is sufficient enough, I do believe, for me to move forward in

25   my life.

1          THE COURT:  So when you first started selling gram

2     quantities, what were you charging?

3          THE DEFENDANT:  I picked -- I picked up the gram

4     quantities at 180 a gram.  I sold them for 120 -- I mean 220,

5     to make 40 -- my bad, to make -- to make $40, so that way

6     each -- each time that there was a profitable margin on each

7     purchase.

8          THE COURT:  And were you personally involved in

9     selling, or was it the other four characters that were doing

03:26   10    most of the selling?

11          THE DEFENDANT:  This -- it was the other four

12    characters that mostly had -- I purchased it.  I supplied them.

13    They dealt the -- they dealt the dope, brought me the money.  I

14    took the money and reinvested it.

15          THE COURT:  In dope.

16          THE DEFENDANT:  Yes, sir.

17          THE COURT:  And in terms of division of

18    responsibilities, was there somebody that would weigh the dope

19    and package the dope, somebody that was primarily responsible

03:26   20    for selling, and somebody that was responsible for collecting,

21    and somebody that may have had other responsibilities?  I mean,

22    was everybody doing a little bit of everything?

23          THE DEFENDANT:  No, sir.  There were some -- there

24    was one that was not -- we give -- I give him several different

25    chances to be able to prove his worth, and he just was not

1    mentally or capable of --

2              THE COURT:   Who's that?

3              THE DEFENDANT:   That was James Odeneal.  He was -- I

4    mean, he tried several times.  If he sold very much -- you

5    know, it might have been three grams.  He just did not have the

6    mental capacity to do that.

7              THE COURT:   Is that the guy I saw yesterday?

8              MS. MITCHELL:   No, he was several weeks ago.

9              MR. HAGLER:   No, that was Mr. Tuntland's client that

03:27   10    he's speaking about, Your Honor.

11             THE COURT:   All right.  So my next question is, how

12   does a 46-year-old man, other than being a drug user and these

13   guys are drug users, get associated with a bunch of guys in

14   their early twenties?

15             THE DEFENDANT:   I met -- I met Tyler when I was in

16   the hospital in Minot.  He was in the bed next to me.  His arm

17   had just gotten injured.  At that time his -- him and his wife

18   were having marital problems, and a guy that had come seen me

19   interfered with their marriage.  And a couple of months -- a

03:28   20    couple of weeks later, you know, this guy is in the rain,

21   dumped off in my front porch -- well, back porch, backyard

22   because his wife is leaving him for another man, and he had

23   nothing and nowhere else to go, no confidence in himself

24   whatsoever.

25             I met James Odeneal out at the -- oh, I can't

22

1   remember the name of the -- it's a State park right outside of

2   Williston.  He was trying to fix a car stereo that never got

3   fixed.  I met him and got a ride from him.

4        I met Nick.  He was a friend of Thomas that lived

5   there at the house with Mr. Larry Larson, and he just -- he

6   showed up one night, and he and I started drinking together.

7        Zac come in -- Zac come in right toward -- just a few

8   weeks before -- maybe right at a month before the end of all

9   this, and Zac was -- somebody had taken him and introduced him

03:29  10   to doping and strung him hard.  When I -- when I got a hold of

11   him, the first thing I done to him was I made him go to sleep

12   and eat for at least three days.

13        THE COURT:  So the -- it was Larry Larson that owned

14   the house --

15        THE DEFENDANT:  Yes, sir.

16        THE COURT:  -- behind which you had your camper?

17        THE DEFENDANT:  Yes, sir.

18        THE COURT:  And in the -- and there were more than

19   one camper back there, right?

03:30  20        THE DEFENDANT:  James Odeneal had his camper.  I had

21   my RV, and there was another pop-up camper, and I had just

22   purchased another one set off the property.

23        THE COURT:  And so in your circle of friends, how

24   many people are we talking about that lived in these various

25   campers?

23

1          THE DEFENDANT:   There was -- there was -- there was

2    Nick.   There was James.   There was Zac.   And there was Tyler.

3          THE COURT:   Okay.   And then you and your wife.

4          THE DEFENDANT:   And me and my wife, yes, sir.

5          THE COURT:   Okay.   And you handled all the money.

6          THE DEFENDANT:   Most -- most of the money when it

7    come -- when it come to handling the money for the purchase of

8    the dope, yes, sir.   They received -- they received money when

9    they needed spending money in amounts of 20, 30, 50, 100

03:31   10   dollars from time to time.   It was just getting -- it was

11   getting to the point to where the profit -- the profit margin

12   was starting to get higher.   It was starting to get larger.

13         THE COURT:   And when the profit margins were

14   increasing up close to the time that it all came crashing down,

15   what kind of revenue were you generating weekly?

16         THE DEFENDANT:   From the cost -- from the base cost

17   that I was spending -- I was spending 28 -- 2,800 an ounce, and

18   I was turning at 4,000 an ounce, and I was turning an ounce

19   every two days.

03:32   20         THE COURT:   So 2,500 bucks every couple days, give or

21   take a few hundred bucks, or more than that?

22         THE DEFENDANT:   It was probably around 2,200, and

23   then I would give -- in a week -- in a week I was probably --

24   the profit margin was probably 2,200 for a whole week because

25   you had -- you had gas expenses, what I consider, you know --

24

1          THE COURT:  But I mean your profit margin on the dope

2     was 2,200 bucks every two days.

3          THE DEFENDANT:  Yes.

4          THE COURT:  Okay.  So how long did you -- these four

5     other gentlemen, you knew them for about how long before the

6     end of August 2012, when it all came to a halt?

7          THE DEFENDANT:  Like I said, I met -- I met Tyler in

8     April, and it was probably a couple weeks after that is when I

9     met James, and it was about -- when I moved into Larry Larson's

03:33     10     backyard in May is when I met Nick.

11          THE COURT:  And so when somebody owed a drug debt to

12     your group, who would have primary responsibility to collect

13     that?

14          THE DEFENDANT:  The primary responsibility was mine.

15     It was mine.  I delegated that to -- in between Nick and

16     another person at this time.

17          THE COURT:  Another person that was not a part of

18     your circle that lived in the campers.

19          THE DEFENDANT:  Right.

03:33     20          THE COURT:  Somebody from Williston.

21          THE DEFENDANT:  Around Williston, yes, sir.

22          THE COURT:  Okay.

23          THE DEFENDANT:  And to answer your question from

24     earlier, yes, sir, each person had different levels of tasks to

25     perform in the operation, yes, sir, as in Tyler, he basically

1    weighed and bagged the dope.   Zac and Nick, they were basically

2    the footmen.   They -- they done most of the selling.   James, he

3    done a lot of driving.   He drove.   If I need him to go to the

4    store, if I needed parts, if I needed -- you know, he done --

5    he done a lot of driving because he was -- he was not real

6    capable of being profitable to the point of gaining a monetary

7    gain, but he had uses elsewhere.   And he would watch the yard,

8    you know.

9              THE COURT:   So not all the pistons firing.

10             THE DEFENDANT:   Not at that time, no.

11             THE COURT:   Okay.   So tell me about the hellacious

12    day of August 21, 2012, and how that all evolved.

13             THE DEFENDANT:   You mean August 12th?

14             THE COURT:   Or August 12th, I guess.   It says 21 in

15    the Plea Agreement, but that must be a mistake.

16             THE DEFENDANT:   No, sir, it was August the 12th.

17             MS. MITCHELL:   It is the 12th.   The Indictment says

18    the 12th.

19             THE COURT:   But the Plea Agreement, paragraph 6,

20    Count 1 first refers to August 12th, and the second paragraph

21    on the top of page 3 says August 21st, so I'll go along with

22    the 12th.

23             MS. MITCHELL:   I actually -- I had it circled and --

24             MR. HAGLER:   Those numbers were transposed in that

25    second spot, Your Honor.   It should all reference August 12th.

1          THE COURT:  Okay.

2          THE DEFENDANT:  Well, the morning of August 12, 2012,

3    my wife and I -- this is approximately 7 o'clock in the

4    morning.  We exited our camper, and Mr. Robert Osterhout was

5    sitting toward -- when I come out of my camper, he was to my

6    left, coming out of Tyler's and Nick's camper.  James' camper

7    sat directly in front.  My wife had went to the bathroom inside

8    the house.  I turned around to come back inside.  I had

9    forgotten something or was answering the phone, or something,

10   and I stepped back out and Robert Osterhout come up to me and

11   asked me where my wife was, which was an unusual question

12   because he seen and he heard the conversation that she's going

13   to the bathroom, and I said, "She's gone to the bathroom."

14   Well, he took off to go ask her a question.

15          I had hung around the camper for just a second or a

16   few seconds longer, and I seen my wife coming back, so I went

17   toward the bathroom because it's just a one-person bathroom in

18   the house and I said, "Where's Robert?"  And she goes, "Well,

19   he just took off walking down the road."  I said, "Really?"  I

20   said, "Well, he owes me a hundred dollars, and I'm supposed to

21   take him to his house to go get it."  She said, "Well, he

22   wanted a ride to Walmart and said he wanted to be dropped off

23   at Walmart."

24          THE COURT:  Owes you a hundred bucks for dope?

25          THE DEFENDANT:  Yes, sir.  Well, yes, sir.

1          THE COURT:   Okay.

2          THE DEFENDANT:   Yeah.   I knew right then something --

3    something didn't click.   I walked in and I looked at Tyler.

4    Tyler was passed out asleep.   I woke Tyler up.   I said, "Tyler,

5    hey, where -- where's your stuff at?"   He goes, "What?   What?

6    It's in my pocket," and he jumped up and looked and it was

7    gone.   I told Zac then, I said, "Get in the Jeep.   We've got to

8    go find" --

9          THE COURT:   "Stuff," you mean meth.

03:38    10          THE DEFENDANT:   Dope.

11          THE COURT:   Okay.

12          THE DEFENDANT:   At that time I grabbed Zac and we

13    went down to the Kum & Go, and Mr. Osterhout was standing at

14    the end out by the road where the trash cans were.   I pulled up

15    and I told Zac to go in and get me a cup of coffee because I

16    hadn't had a cup of coffee for the day yet.   And I told

17    Mr. Osterhout that I needed to speak with -- speak with him

18    because there was something wrong.   At that time he began to

19    look a little nervous, a little shaky.   He was walking back and

03:38    20    forth.

21          I told him he needed to come back to the house with

22    us because Tyler had a problem, and he popped off and said, "If

23    you got a question to ask me, ask me."   I said, "Where's the

24    dope?"   He said, "I have it in my pocket."   I said, "So you

25    stole that dope from Tyler."   He goes, "No, I protected it so

1    nobody else would get it."  I said, "You reached in his pocket
2    while he was asleep and got that dope."  He said, "Yes, I did."
3    I said, "Hand it back to me.  Don't ever come around.  Don't
4    ever call Tyler again at all."  At that point in time, Zac and
5    I left Kum & Go.  Approximately --

6          THE COURT:  With the dope that --

7          THE DEFENDANT:  Yes, sir.  Yes, sir.  Approximately
8    two hours, maybe two-and-a-half hours after that I get a call
9    on my phone, which the only way Robert Osterhout could have
10   gotten my phone number was to go through Tyler's phone or one
11   of the boys because my phone number was not to be given out
12   just to anybody.  And I looked, and I didn't recognize the
13   number, so I answered it, and it was Robert Osterhout, and he
14   said, "I need $300 worth of dope."  And I said, "You have got
15   to be kidding me.  You had just stole off of us and you're
16   calling me."  I said, "Don't call here again," and hung up on
17   him.

18          The number rung again and I looked at it, and I
19   looked and I seen it was the same number, so I hit the ignore
20   button.  A few minutes later I listened to the voice mail.  The
21   voice mail said -- told me -- he said, "Hey, Pop, if you don't
22   sell me this $300 worth of dope, I'm going to the police and
23   telling about the whole situation."  And I went and played that
24   recording for Tyler, Nick, James and Zac, and they said, "What
25   do you want to do?"  I said, "I want to talk to him."  I says,

29

"I want to find out what his major malfunction is."  I said,
"We've been good to him."  I said, "We have given him
cigarettes, given him, you know, free -- free dope.  He's in
debt a hundred dollars."  I said, "I'll wipe that clean.  I
want to talk to him."  And they said, "We'll go find him."  I
said, "No, he'll show up sooner or later."

Right around 4 o'clock I had just showed back up at
the house or back at the backyard with Zac because I -- I had
left with Zac to go get -- to go get some beer, and we went and
picked up a girlfriend that he had and we went, rode around for
a little bit and come back, and we were in the backyard.  I
took the girl that was with Zac into the camper with me and my
wife when we were talking because this lady had some issues of
her estranged boyfriend beating on her.  And I told her, I
said, "Well, you don't have to worry about that anymore."  I
said, "He won't touch you again."

I get a text on my phone.  It's in between 4:00,
4:30, around 5:00, something around in that neighborhood.  He's
here.  I went out.  I did not see -- I did not see Robert at
that time.  I did not see what trailer that they had him in.  I
talked to Nick and I talked to Tyler.  I said, "You all keep
him cool, keep him comfortable, smoke a little weed, let him
drink a little beer until I have a chance to talk to him."  I
walked back into the trailer and was trying to entertain my
wife and the girl that was there.

30

1    At that time, at 10 o'clock that night I'm -- I've

2  heard scuffling a couple times in the camper.  At 10 o'clock

3  that night when I walked up and I looked inside the camper and

4  I seen Mr. Osterhout laying in the -- laying in the camper with

5  what appeared at that time clear -- clear tape over his mouth,

6  the left -- let's see, the left eye socket, I believe it was,

7  seemed to be indented in and his eye seemed to be hanging out.

8  Half of an ear, I think, was cut and pretty bloody and beaten

9  really, really bad.  I looked and I said, "Oh, my God, we got

10  to clean this up," and that's when I instructed -- at that time

11  I instructed James to clean out Mom's car.  I said, "Clean out

12  Mom's car, get the plastic from downstairs, put it in the

13  trunk."

14         THE COURT:   Mom's car was --

15         THE DEFENDANT:   Was my wife's car.

16         THE COURT:   All right.

17         THE DEFENDANT:   Because when I seen Mr. Osterhout at

18  that time and I seen him laying there, I did not see any

19  movement in the chest.  He did not move.  I thought he was dead

20  already.  I thought that they had done killed that boy, and

21  that's when everything started pretty much going on the chaotic

22  side.

23         THE COURT:   And you were high at the time?

24         THE DEFENDANT:   Yes.  Yes, sir, I was.

25         THE COURT:   All right.

03:43

03:44

1         THE DEFENDANT:  And all -- all five -- or all four

2  boys were high too at that time.

3         THE COURT:  So everything that was suggested by

4  anybody all made sense because everybody --

5         THE DEFENDANT:  Sir?

6         THE COURT:  -- was intoxicated.

7         THE DEFENDANT:  I mean, at that -- you know, at that

8  time, when I said -- because I'm thinking they done killed this

9  boy and I was -- I mean, I told them I would always help them

10  and always protect them, and I'm thinking, okay, I can't go

11  straight up to the police.  You know, and I know that's the

12  wrong way a lot of people look at it, but, I mean, I'm

13  thinking, oh, God, how do we get out of this?  You know, what

14  has happened here?  I never -- I never seen what they actually

15  done to him inside that camper, but him laying there, I could

16  smell the burn marks where they had taken a Taser and stuck it

17  to his flesh and just laid it on him.  It was bad.  It was real

18  bad.

19         THE COURT:  And how long had that been going on in

20  the trailer?

21         THE DEFENDANT:  I got the text message that he was

22  there at 4:30, around 4:30 or 5:00.  It was at 10 o'clock at

23  night when I went to the trailer and seen him.

24         THE COURT:  You never got back to the trailer at any

25  time between that time frame?

1          THE DEFENDANT:  No, sir.  I was -- at that time I was

2    in -- I was in my camper with Ms. Woodward and my wife.

3          THE COURT:  Ms. Woodford?

4          THE DEFENDANT:  Woodford, yes.  Not Woodford,

5    Harwood.  My bad.  Harwood.

6          THE COURT:  And who is that?

7          THE DEFENDANT:  That was the -- that was the girl

8    that Zac had been seeing.

9          THE COURT:  Okay.

03:46   10          THE DEFENDANT:  At that time --

11          THE COURT:  So you didn't hear any screaming,

12    yelling, cursing?

13          THE DEFENDANT:  I heard -- I heard -- I never heard

14    any screaming.  I heard scuffling, you know, in between that

15    time, but never -- I mean, nothing to the point that it might

16    have been just a little fight.

17          THE COURT:  All right.

18          THE DEFENDANT:  At that time I was more worried about

19    leaving -- leaving my wife and the other girl alone for the

03:47   20    fear of what the other girl would say to my wife.

21          THE COURT:  What does that mean?

22          THE DEFENDANT:  Well, I was afraid that that girl was

23    going to start saying something about the little ride that her

24    and Zac and I had taken and was out together with, and that --

25    that kind of -- yeah, that worried me a little.

33

1          THE COURT:  So what, the three of you were out

2     fooling around in a car someplace, or what?

3          THE DEFENDANT:  Yeah.

4          THE COURT:  Okay.  So then somebody lined the car

5     with plastic and dumped the body in the back of the car trunk.

6          THE DEFENDANT:  When I seen them pick -- when I seen

7     them pick Robert Osterhout up and put him in the trunk -- when

8     they put him in the trunk, I seen no movement from him at all,

9     none.  When the trunk was shut, I told James to stay and watch

10    the yard.  Me, Tyler, Nick, and Zac got in the car to go take

11    what I appeared as Mr. Osterhout being deceased at that time

12    off and dump a body, yes, sir.

13         THE COURT:  And who would -- who drove?

14         THE DEFENDANT:  I did.

15         THE COURT:  And you just drove out to the middle of

16    nowhere, somewhere west of Williston.

17         THE DEFENDANT:  Yes, sir, we drove -- at that time it

18    seemed like it took forever, but it wasn't -- it wasn't that

19    long.  We drove into Montana, passed, I want to say, one, two

20    little towns out in Montana, and I took a left and went through

21    some dirt roads.  And my intentions was just opening up the

22    trunk and putting a body on the side of the road.  We drove by

23    a farmhouse, and I went to make a three-point turn, and in the

24    middle of this three-point turn, the trunk opens up and

25    Mr. Osterhout takes off running out of the car.  At that point

1    in time was the only time that I said, "Get him," because at

2    that time I really started to freak out.  The only time I ever

3    initiated or said anybody to put for me -- for anybody to put

4    their hands on him was at that time.  I said, "Get him, grab

5    him."

6            They chased him into the field.  Nick, Zac and Tyler

7    left the vehicle and chased him into the field.  By the time I

8    got the car facing the direction that we had come from and shut

9    the lights off and went into the field, by the time I got up on

10   where Mr. Osterhout was, I seen Nick raring back.  This is the

11   only time I seen anybody physically touch him.  I seen Nick

12   raring back with a -- I appeared with a rock in his hand, and

13   he was hitting Mr. Osterhout around the facial area.  It may

14   have been his closed fist.  It was dark.

15           I run up there.  His feet are kicking.  The only time

16   I heard him say anything, that's when he said help.  And I

17   grabbed a hold of his legs, and he kicked me in the mouth, and

18   I grabbed a hold of his legs.  At that time Tyler was standing

19   there and was about to take a leak right there, and I told him

20   to go back to the car.  He left and went to the car.  When Zac

21   and Nick got up off of him, they began to stomp Mr. Osterhout

22   around the -- around the chest and neck area, and I smelled

23   poop, and he twitched a couple times and I thought he was dead

24   for the second time, and that's when I said, "Get in the car."

25           THE COURT:  All right.  And then you headed back to

35

1    Williston.

2              THE DEFENDANT:   Yes, sir.

3              THE COURT:   And then it was a couple weeks later that

4    you were arrested?

5              THE DEFENDANT:   Yes, sir, right at 13 days.

6              THE COURT:   So how does one carry on a normal

7    day-to-day lifestyle after an incident like that?

8              THE DEFENDANT:   It's not easy.   It changes a person.

9    What happened to Mr. Osterhout shouldn't have happened.   It --

03:51   10   it at one time -- you know, this is after -- after the fact and

11   I was talking to the boys.   One of them -- I'm not going to say

12   which one at this point unless instructed to -- seemed

13   overjoyed --

14             THE COURT:   Oh, I think I know who that is.

15             THE DEFENDANT:   -- about what had happened.

16             THE COURT:   Right.

17             THE DEFENDANT:   And had went just ape crazy telling

18   people about it, and I'm thinking --

19             THE COURT:   From what I recall, Mr. Woodford seemed

03:52   20   to find some great joy in --

21             THE DEFENDANT:   Yes, sir, he did.

22             THE COURT:   -- beating the you-know-what out of

23   people.

24             THE DEFENDANT:   Yes, he did.

25             THE COURT:   And then ultimately when you were

36

1    arrested, was that at your camper?

2              THE DEFENDANT:   Yes, sir, I had just stepped outside

3    my camper.

4              THE COURT:   And everybody else arrested about the

5    same time?

6              THE DEFENDANT:   At the same time.

7              THE COURT:   All in the same --

8              THE DEFENDANT:   All except -- all except for Zac.

9    Zac had -- Zac had done -- either he stole it off of me or he

03:52    10  had done way too much dope.   He had zipped off.   He took -- he

11   took Ms. Harwood and went into Montana.   He had thought we were

12   circling him at a convenience store in Montana, when we were

13   sitting at the backyard, and I'm telling him, "Dude, you are

14   spun.   You just need to come on home," and he was freaking out

15   that we were all going to try to go kill him.   And then he

16   started -- he went -- when the cops showed up at his aunt's

17   house, he's the one that started bumping his gums about the --

18   about what he thought at the -- everybody thought that

19   Mr. Osterhout was dead at that time, and he --

03:53    20           THE COURT:   So in the days following this incident,

21   there must have been a point in time when all of you sat around

22   and decided that you were going to come up with a consistent

23   story if confronted by law enforcement.

24              THE DEFENDANT:   I was thinking of that on the way

25   back.

1          THE COURT:   Okay.

2          THE DEFENDANT:   And the story was to go, the last

3    time anybody had seen Mr. Osterhout was on the 12th, around

4    5:00 or 6:00.   He had stopped by Larry's.   He was high and just

5    admitted that he had ripped -- ripped some people off, and he

6    was run off from the backyard, and that was the last -- and

7    that was --

8          THE COURT:   Kind of half truth.   I mean, it's --

9          THE DEFENDANT:   Yeah.   I mean, as far as the knife

10   and the cellphone and the soda bottle being left there in

11   Montana at the crime scene, until I got arrested, I didn't know

12   that had happened.

13         THE COURT:   So do you feel that you've had sufficient

14   time to talk to your attorney about this case?

15         THE DEFENDANT:   Yes, sir, I have.

16         THE COURT:   And you've been given an opportunity at

17   some point in time to review the discovery and the evidence

18   that the Government has compiled and turned over?

19         THE DEFENDANT:   Yes, sir.

20         THE COURT:   And in terms of the Plea Agreement that

21   was signed in this case, did you read that over and review it

22   with your attorney?

23         THE DEFENDANT:   Yes, sir, I have.

24         THE COURT:   And I want to make it clear that if

25   you've got any questions about the Plea Agreement, the

1    sentencing guidelines or anything else that goes on here today,

2    you can ask questions.   You're not prohibited from asking

3    questions.

4              So let me tell you what the penalties are for these

5    offenses.   The kidnapping offense set forth in Count 1 of the

6    Indictment is a felony.   It carries a maximum of up to life in

7    prison, a maximum fine of $250,000.   You can be placed on

8    federal supervision for five years.   There's a requirement that

9    you pay a special assessment of $100.   Those are the maximum

10   penalties.

11             For Count 3, the drug trafficking offense, it carries

12   a maximum of up to 20 years in prison, a maximum fine of a

13   million dollars, placement on federal supervision for three

14   years, and the payment of a $100 special assessment.   Any

15   questions about those maximum penalties?

16             THE DEFENDANT:   No, sir.

17             THE COURT:   And in terms of the kidnapping offense, I

18   have the discretion to order you to pay what's called

19   restitution as a part of the sentence, and in a case like this

20   where somebody was seriously injured, that would be repayment

21   of medical bills, wage losses, things of that sort sustained by

22   the victim.   I know from other pleas I've taken in this case,

23   that the Government doesn't have a clear handle on how much

24   that would be, but I just want you to know that I have the

25   discretion at the time of sentencing to order each and every

03:55

03:56

1    one of you to pay restitution --

2            THE DEFENDANT:  Yes, sir.

3            THE COURT:  -- in an amount to be determined by

4    myself if the parties can't agree on it, understood?

5            THE DEFENDANT:  Yes, sir.

6            THE COURT:  Okay.  Then I also want to make sure that

7    you understand what your Constitutional rights are, and those

8    have been outlined in detail in the Plea Agreement.  The most

9    important right that you and any defendant has is a right to a

03:57   10    jury trial.  That means that no defendant ever has to plead

11    guilty.  Every defendant has a right to demand a trial.

12            If you demanded a trial in the case, then the

13    evidence would be presented in this courtroom to 12 jurors

14    selected by both attorneys, and the jury in a federal criminal

15    case has to unanimously agree as to whether a person is guilty

16    or not guilty.  And it is the Government, not you, that has the

17    burden of proof.  The Government has to call witnesses and

18    present evidence and convince all 12 jurors that you are guilty

19    of the essential elements of these two crimes.

03:57   20            At a trial you're represented by your attorney, if

21    you wish.  Your attorney would have the opportunity to

22    cross-examine and question and challenge any of the

23    Government's evidence.  You would have the right to testify at

24    a trial and the right to present a defense and the right to

25    have witnesses brought in at government expense to testify for

40

1    you.

2           But you can opt to go to trial and remain silent.

3    You have a Constitutional right to remain silent, and that

4    means that nobody could ever put you on the stand and question

5    you about what's gone on here.  You can go to trial, not say a

6    word, and the jury is not to hold that against you because I

7    tell them that just because a defendant goes to trial and

8    chooses to remain silent, they are not even to discuss that.

9    They are not to reach any conclusion that somebody is guilty

03:58    10   because they haven't testified.  Do you understand that?

11           THE DEFENDANT:  Yes, sir.

12           THE COURT:  And when you go to trial, if you were

13   found guilty by the jury of any of these offenses, you have a

14   right to appeal that.  You can appeal the jury's decision.  You

15   can appeal the sentence that I might order you to serve after a

16   finding of guilt by a jury.  Any questions about that?

17           THE DEFENDANT:  No, sir.

18           THE COURT:  You also have a right to plead guilty, as

19   does every defendant.  Nationwide in the federal system,

03:59    20   95 percent of criminal cases are resolved by defendants signing

21   plea agreements and entering pleas of guilty in open court, and

22   that's largely true in the state system as well.  But when you

23   make that decision to plead guilty here this afternoon, then

24   you give up some important things in your life.  You give up a

25   right to a jury trial.  Do you understand that?

1              THE DEFENDANT:  Yes, sir.

2              THE COURT:  And in the Plea Agreement, which I will

3      talk to you about in a few minutes, you have also agreed to

4      give up your right to appeal these convictions and the sentence

5      that I order you to serve as long as I sentence you in

6      accordance with what the sentencing guidelines indicate is your

7      sentence range, understood?

8              THE DEFENDANT:  Yes, sir.

9              THE COURT:  And you've decided that you wish to plead

03:59   10     guilty to both counts here this afternoon?

11             THE DEFENDANT:  Yes, sir.

12             THE COURT:  Anybody forced you, intimidated you or

13     threatened you in any manner or fashion to come in here to

14     plead guilty this afternoon?

15             THE DEFENDANT:  No, sir.

16             THE COURT:  Is it fair to say that this is a decision

17     that you have made on your own?

18             THE DEFENDANT:  Yes, sir.

19             THE COURT:  Do you have any questions?

04:00   20     THE DEFENDANT:  No, sir.

21             THE COURT:  Okay.  And then in terms of the

22     sentencing guidelines, I had Mr. Hagler summarize here at the

23     start of the hearing what the Government thought the sentencing

24     guideline calculations would be.  In the Plea Agreement at

25     paragraph 13, which you have agreed to, it outlines what the

42

1  parties agree and expect the guideline calculations will be.

2        And the guidelines are in place in the federal system

3  for a purpose.  They're there to provide some consistency in

4  how defendants are treated and how they are sentenced

5  throughout the country.  Most states do not have sentencing

6  guidelines.  We've had these sentencing guidelines in the

7  federal system for more than 20 years.  And again, the purpose

8  is to provide some fairness so that a defendant who's charged

9  with these two types of crimes and who has a criminal history

04:01   10  that might be similar to yours is generally going to receive

11  much the same sentence whether they're in North Dakota or Texas

12  or any place else.

13        THE DEFENDANT:  Yes, sir.

14        THE COURT:  When they say that the guidelines are

15  advisory, that means that I can follow them or I can choose not

16  to follow them.  And the guidelines are only one of many

17  factors that need to be considered before a judge orders a

18  sentence, but nationwide I can tell you that the sentencing

19  guidelines, although advisory, play a very significant role in

04:01   20  the sentences that are handed out by federal judges.  The

21  federal government keeps very detailed statistics about

22  sentencings in federal court.  They know every sentence that

23  every judge has ever handed down and whether it is in

24  conformance with the guidelines or not.

25        There are 80,000 defendants sentenced in federal

43

1  court every year.  Eighty percent of the time defendants

2  receive a sentence that comports with the sentencing guidelines

3  or it comports with what the Government may have recommended if

4  there has been some cooperation and assistance provided by a

5  defendant.  So in other words, 80 percent of the time, no

6  matter where you are in the country, as a defendant you're

7  likely to receive a sentence that falls within the guidelines,

8  understood?

9          THE DEFENDANT:  Yes, sir.

10          THE COURT:  Okay.  And there's two factors that

11  impact your sentence.  One is the crime.  One is your criminal

12  history.  The more serious your criminal history is, the longer

13  your sentence is.  And in terms of the crime, every crime, as

14  you can see in the Plea Agreement at paragraph 13, has a

15  certain numerical value, and there may be upward or downward

16  adjustments to that particular crime; in a case like this,

17  depending upon the type of injury and whether there were

18  firearms involved, whether there's violence involved, whether

19  one is considered to be an organizer or a leader.  All of those

20  are independent factors that might impact the numerical value

21  associated with a crime.  That's all laid out in paragraph 13.

22          And as Mr. Hagler indicated and as the Plea Agreement

23  reveals, it is expected that when we look at both of these two

24  crimes together, you are going to end up, after all the

25  adjustments are made, with what's called an adjusted offense

04:02

04:03

44

1   level of 41.  And did you say the defendant has a criminal

2   history of --

3            MR. HAGLER:  I anticipate, Your Honor, it's probably

4   going to be a IV.

5            THE COURT:  Okay.  So let's -- at an offense level of

6   41, then the judge and the attorneys all turn to a sentencing

7   table within the guidelines, and at a level of 41, whether you

8   are a Criminal History Category II, III, IV, V or VI, the

9   sentence range is all the same.  It's 360 months; namely,

10   30 years to life.  Is that what you've been told?

11            THE DEFENDANT:  Yes, sir.

12            THE COURT:  Okay.  Now, again, there's other factors

13   that I need to consider.  If there's been cooperation and

14   assistance provided by a defendant, then what typically happens

15   is that the Government comes in, they file a motion requesting

16   that I order a sentence below the guidelines.  It's called a

17   Section 5K1.1 motion.  That's the section in the guidelines

18   that allows for that.  And if the Government requests that I go

19   below the guidelines based upon a defendant's cooperation and

20   assistance, I generally grant those motions.  I don't always go

21   along with what the Government recommends for a departure

22   downward.  Sometimes in this district they typically come in

23   and request one-third off of the guideline sentence.  Sometimes

24   it's 50 percent.  Sometimes it's 25 percent.  Every case is

25   different.

04:04

04:04

45

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  And that varies all over the country.

3   There's no standardized procedure in any district as to whether

4   somebody should get 25 percent off, 40 percent off, 50,

5   75 percent off if they cooperate.  It's all over the board

6   around the country.

7          THE DEFENDANT:  Understood.

8          THE COURT:  Whatever the Government recommends, I

9   don't have to accept.  Whatever your attorney thinks would be

04:05   10   fair, I don't have to accept that either.  I have some factors

11   that I need to rely upon in Section 5K1.1, and ultimately I

12   would have the final say about whether there's going to be a

13   departure below the guidelines based on one's cooperation, and

14   if so, how much that's going to be.

15          THE DEFENDANT:  Yes, sir.

16          THE COURT:  Okay.  Any questions so far?

17          THE DEFENDANT:  No, sir.

18          THE COURT:  All right.  Then I want to talk to you

19   briefly about the Plea Agreement.  I think we've covered most

04:05   20   of what's in here, but first and foremost, I want to find out

21   if you're the one that signed that Plea Agreement on April 5th.

22          THE DEFENDANT:  Yes, sir, that's me.

23          THE COURT:  And you're able to read, and you did read

24   the Plea Agreement?

25          THE DEFENDANT:  Yes, sir.

46

1          THE COURT:   Okay.   And if you could turn then to

2     paragraph 24 of the Plea Agreement found on pages 15 and 16, do

3     you see that?

4          THE DEFENDANT:   Yes, sir.

5          THE COURT:   That paragraph is entitled "Appeal

6     Waiver."   Those words are bolded and they're underlined, and

7     they're underlined for a reason, because it's an important

8     paragraph.   Appeal waiver in very simple terms means giving up

9     your right to appeal.   This paragraph is designed so that you

04:06   10     give up your rights of appeal and we are not entangled in more

11     legal challenges to what's gone on here in this case.

12          And the paragraph contains a lot of lawyer -- fancy

13     lawyer language, legal gibberish, but when you cut through all

14     that, let me tell you what it means.   Appeal waiver in this

15     paragraph for you means that if we get to the sentencing

16     hearing, and let's just say the Government doesn't move for a

17     departure based on some cooperation provided and the guideline

18     range is 360 months to life -- I'm just using that as an

19     example.   If I sentence you anywhere from 360 months to life,

04:07   20     under those circumstances, in this paragraph you are agreeing

21     that you are not going to challenge that or appeal that.   You

22     have agreed that you will not challenge these convictions and

23     that you will not challenge the sentence as long as I sentence

24     you within the guidelines.   That's what it means.   When you

25     wade through and cut through all the legal stuff, that's what

47

1      it means.   Do you understand?

2                  THE DEFENDANT:   Yes, sir.

3                  THE COURT:   Okay.   And the Courts of Appeals around

4      the country have said it is permissible to put a paragraph like

5      this into a Plea Agreement, and the Courts of Appeals have

6      universally said to defendants, "We will enforce this.   If you

7      choose to appeal after you've been sentenced within the

8      sentencing guidelines that are found to apply to you, we are

9      going to enforce this against you."   And 99.9 percent of the

04:08   10     time when a defendant appeals, it goes nowhere.   It gets thrown

11     out.   It gets dismissed because the Courts have said, "You

12     signed a contract, Mr. Defendant.   We're going to hold you to

13     it," so it's an important paragraph.   I want to make sure you

14     clearly understand what it means for you.   Do you have any

15     questions about paragraph 24?

16                 THE DEFENDANT:   No, sir.

17                 THE COURT:   All right.   And then if you could turn to

18     paragraph 6 of the Plea Agreement found on pages 2 through 5,

19     paragraph 6 is a rather detailed summary of the facts in this

04:08   20     case like we've been talking about because before any judge can

21     accept a plea from a defendant, he or she needs to make sure

22     that there are sufficient facts that support finding a

23     defendant guilty of what he intends to plead guilty to.

24     Paragraph 6 is just designed to lay out what those facts are.

25     When you signed the Plea Agreement, you essentially

48

1   acknowledged that you've read it and you agree with it.  So my

2   question to you is, do you agree that the factual information

3   contained in paragraph 6 of the Plea Agreement is accurate?

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  Mr. Hagler or Ms. Mitchell, anything else

6   you want to note in terms of a factual basis for this plea?

7          MR. HAGLER:  No, Your Honor.

8          MS. MITCHELL:  Other than, again, the typo, the

9   August 21st versus August 12th.

10          THE COURT:  Fully understood.

11          MS. MITCHELL:  Nothing else.

12          THE COURT:  So, Mr. Butler, we've come to that stage

13   where I'm simply going to ask you how you plead to Counts 1 and

14   3.  I can read the entire count to you.  I can summarize it for

15   you.  If you're comfortable with me summarizing, I'd be happy

16   to do that, but if you want me to read it all to you, I'll read

17   it to you.

18          THE DEFENDANT:  It's getting late, Your Honor.  Let's

19   all go home.

20          THE COURT:  Summarization is fine with you?

21          THE DEFENDANT:  Yes, sir.

22          THE COURT:  All right.  Count 1 as set forth in the

23   Indictment is entitled kidnapping.  We've been talking about

24   that count at some length.  With respect to Count 1, the

25   kidnapping charge, sir, how do you wish to plead, guilty or not

49

1   guilty?

2          THE DEFENDANT:   Guilty.

3          THE COURT:   Count 3 is entitled conspiracy to

4   distribute and possess with intent to distribute

5   methamphetamine.   How do you wish to plead to Count 3, sir,

6   guilty or not guilty?

7          THE DEFENDANT:   Guilty.

8          THE COURT:   The Court accepts your plea of guilty to

9   Counts 1 and 3, Mr. Butler.   I find that you are a competent,

10  intelligent man who understands what you've been charged with

11  and what the penalties are under federal law.   I find that you

12  have entered a knowing and voluntary plea of guilty here this

13  afternoon.   I also find that there are sufficient facts that

14  you have agreed to that would support finding you guilty of

15  each of these crimes as required under Rule 11 of the Federal

16  Rules of Criminal Procedure, so I accept your pleas of guilty.

17         What will happen next in this process -- it's the

18  same in every case -- is that I'm ordering the U.S. Probation

19  Office to prepare a presentence investigation report.   I've

20  been told by Ms. Helderop that she's going to undertake that

21  task and that she's already interviewed you.

22         THE DEFENDANT:   Yes, sir.

23         THE COURT:   And there may be others that she'll

24  interview.   I think she's probably doing the presentence

25  reports on all of this -- all of the defendants.   And she'll

04:10

04:11

50

1    type up a report that's a very detailed summary about you and

2    what went on in this case and what your criminal history

3    consists of and what the sentencing guidelines say, and all of

4    that goes into this comprehensive report.  It is primarily used

5    for sentencing purposes.

6          It will take probably at least two months to complete

7    that task.  When she completes the report, it's sent out to

8    both attorneys in a draft form.  I never see it then.  We give

9    everybody a chance to look it over and comment on its accuracy.

10   Ms. Mitchell will get it immediately into your hands when it

11   comes out in draft form.  I'm requesting that you read it and

12   you read it thoroughly.  And when you're reading it, if there's

13   anything that you believe is not accurate, it's very important

14   that you let her know that so she can contact the probation

15   officer.

16          THE DEFENDANT:  Yes, sir.

17          THE COURT:  When you're reading it, if you have any

18   difficulty reading, if there's anything you don't understand,

19   if it's too much legal garbage, call her up.  She can explain

20   what it all means for you.  She looks at these reports every

21   day.  She can tell you what it means for you.  And when you get

22   to reading about the sentencing guidelines, you may have

23   questions about that.  That's not so easy to understand for

24   anybody, so ask questions.  If you don't ask questions, then

25   everybody concludes that you agree with what's in there.

51

1          THE DEFENDANT:   Exactly.

2          THE COURT:   So you need to know what's in there.

3     It's important that you know what's in there and ask questions.

4     Don't for a fleeting moment think that you're wasting her time

5     by asking a question.   Don't think that it's going to make you

6     look stupid or you're ignorant for asking a particular

7     question.   No, there's no such thing.   If you've got a

8     question, it needs to be asked no matter what it is, and you'll

9     get an answer to it.

04:13     10          Ultimately the report is finalized.   It's sent out

11     again to everybody, including yourself.   I get those reports a

12     couple weeks before the sentencing hearing.   I read them all

13     many times before I get to the sentencing date.   Sentencing has

14     been scheduled now for Friday, July 19th, at 2:15 p.m. in

15     Bismarck.   That may change depending upon everybody's schedule

16     and what's going on with you and the Government and everybody

17     else, so -- but every time -- every day you're in custody,

18     you're getting credit for that.   You'll remain in custody until

19     the sentencing hearing, and that's kind of the chronology of

04:13     20     things over the next few months here.   Questions?

21          MS. MITCHELL:   He was just asking -- he wants to go

22     back to Devils Lake because he has a job in Devils Lake and is

23     making decent money, but I know John has already told him that

24     that's the plan.

25          THE COURT:   That's the plan.

52

1              THE DEFENDANT:  Okay.

2              THE COURT:  It's all up to the U.S. marshals.  It's

3    not up to me.  Any other questions, concerns?

4              THE DEFENDANT:  No, sir, I sure don't.

5              THE COURT:  All right.  Ms. Mitchell or Mr. Hagler,

6    anything else?

7              MR. HAGLER:  No, Your Honor.

8              MS. MITCHELL:  No, Your Honor.

9              THE COURT:  Thank you.  We are adjourned.

10             (Concluded at 4:14 p.m., the same day.)

11                        - - - - - - - - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

04:14

1                    CERTIFICATE OF COURT REPORTER

2            I, Sandra E. Ehrmantraut, a Certified Realtime

3      Reporter,

4            DO HEREBY CERTIFY that I recorded in shorthand the

5      foregoing proceedings had and made of record at the time and

6      place hereinbefore indicated.

7            I DO HEREBY FURTHER CERTIFY that the foregoing

8      typewritten pages contain an accurate transcript of my

9      shorthand notes then and there taken.

10           Dated this 15th day of July, 2013.

11

12                          /s/ Sandra E. Ehrmantraut
                            Certified Realtime Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25